**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CROWN CASTLE FIBER LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:20-cv-2692-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| CITY OF CHARLESTON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on plaintiff Crown Castle Fiber LLC's

("Crown Castle") motion for partial summary judgment, ECF No. 15. For the reasons set

forth below, the court grants in part and denies in part the motion.

## I.   BACKGROUND

Crown Castle is a telecommunications services provider that seeks to install and

operate telecommunications facilities in public rights-of-way in the City of Charleston,

South Carolina ("the City"). In order to provide its services, Crown Castle uses fiber

optic lines and equipment figurations called "Nodes." Nodes consist of various pieces of

equipment and are located on utility or streetlight poles. Individual Nodes are also

referred to as "small cells" or "small wireless facilities." To construct its network and

facilities, Crown Castle needs authorization from the City. This case is the latest

manifestation of the long-standing dispute between Crown Castle and the City

concerning Crown Castle's endeavor to obtain such authorization, which was the subject

of a previous lawsuit before this court, Crown Castle Fiber LLC v. City of Charleston,

2:17-cv-02562-DCN ("Crown Castle I").

1

The City's standard process for telecommunications facilities in public rights-of-way is as follows. The entity seeking to install telecommunications facilities must obtain an engineering permit from the Department of Public Service. Separately, the City's Design Review Committee ("DRC") reviews and makes recommendations regarding the aesthetics of the facilities. The DRC's recommendation is required before the Department of Public Service will issue the engineering permit. The City also requires "franchise agreements," sometimes referred to as "franchises," for entities wishing to use the City's rights-of-way. These requirements apply to all entities, but the rights-of-way at issue here include the use of existing utility poles, building new poles, and laying fiber optic lines.

As the court explained in tedious detail in Crown Castle I, Crown Castle has been engaged in efforts to deploy small cell facilities in the City since November 2014, and throughout most of the process, the City has been less than accommodating to the point of near-obstructionism. See Crown Castle I, ECF No. 97 at 2–6. In fairness to the City, Crown Castle's proposals involved new technologies with which the City was not familiar, and City employees testified that the City was interested in learning more about the technology and its impact before approving Crown Castle's applications. Id., ECF No. 79-7, Herdina Depo. 27:1–21. On September 22, 2017, Crown Castle filed Crown Castle I, alleging that the City refused to process or deal with Crown Castle's permit applications and requests to establish telecommunications facilities in violation of 47 U.S.C. § 253. Id., ECF No. 1.

On June 22, 2018, the parties engaged in mediation and reached a Contingent Memorandum of Understanding ("MOU"). The MOU provided a potential resolution of

Crown Castle I subject to the City enacting a small cell ordinance ("the Small Cell Ordinance"). On September 26, 2018, the Federal Communications Commission ("FCC") issued a declaratory ruling, In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 9088 (2018), with an effective date of January 14, 2019 ("FCC Declaratory Ruling"). At the time, the City was still working on drafting the Small Cell Ordinance. Crown Castle then took the position that various portions of the City's draft version of the Small Cell Ordinance would be illegal once the FCC Declaratory Ruling took effect. Pursuant to the MOU, on November 27, 2018, the City adopted the Small Cell Ordinance. ECF No. 15-2. Simultaneously, the City adopted the "Small Cell Infrastructure Right-of-Way Design Guidelines," which "establish general standards for [ ] Wireless Service Providers to deploy and maintain wireless networks in the City['s] Public Right[s] of Way . . . ." ECF No. 15-3 at 2 ("Design Guidelines"). Through a letter dated November 27, 2018, Crown Castle notified the City that it believed that the Small Cell Ordinance violated 47 U.S.C. § 253 as interpreted by the FCC.

Unable to resolve the dispute, Crown Castle filed an amended complaint on May 23, 2019, Crown Castle I, ECF No. 62, and a motion for summary judgment on June 24, 2019, id., ECF No. 67. In its motion for summary judgment, Crown Castle argued that the City violated 47 U.S.C. § 253(a) as a matter of law by actually and effectively prohibiting Crown Castle from providing telecommunications services, and that the City failed to act in a timely manner on Crown Castle's sixteen applications in violation of 47 U.S.C. § 332(c)(7)(B)(ii). Crown Castle sought an injunction requiring the City to accept

Crown Castle's applications and permit Crown Castle to install and maintain fiber optic lines.

On March 23, 2020, the court granted Crown Castle's motion for summary judgment in part. Id., ECF No. 97 (the "Crown Castle I Order"). Specifically, the court held that the City's failure to act on Crown Castle's applications within the appropriate timeframe violated 47 U.S.C. § 332(c)(7)(B)(ii) and granted summary judgment in favor of Crown Castle to that extent. The court rejected Crown Castle's proposed remedy— ordering the City to grant its applications—and instead directed the City to act on Crown Castle's sixteen then-pending applications within 90 days. Id. at 24. On June 22, 2020, the City acted on Crown Castle's sixteen applications. The instant dispute concerns the City's resolution of seven of those applications, four of which the City explicitly denied and three of which the City conditionally granted.

On July 21, 2020, Crown Castle filed this action, claiming that: the City's Small Wireless Ordinance, as applied, violates 47 U.S.C. §§ 253 and 332(c)(7)(B)(i)(II) (Count 1); the denials effectively prohibit service in violation of 47 U.S.C. § 253 and 47 U.S.C § 332(c)(7)(B)(i)(II) (Counts 2 and 3); the City's denials are not supported by substantial evidence as required under 47 U.S.C § 332(c)(7)(B)(iii) (Count 4); and the City has failed to timely act on three of the conditionally granted applications in violation of 47 U.S.C. § 332(c)(7)(B)(ii) (Count 5). ECF No. 1, Compl. On November 16, 2020, Crown Castle filed the instant motion for partial summary judgment, requesting that the court enter judgment in its favor on Counts 4 and 5. ECF No. 15. On December 14, 2020, the City responded, ECF No. 17, and on January 1, 2021, Crown Castle replied, ECF No. 20. The

court held a telephonic hearing on the motion on February 11, 2021. Thus, the motion has been fully briefed and is now ripe for the court's review.

## II. STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the court must view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

"The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact." Major v. Greenville Hous. Auth., 2012 WL 3000680, at *1 (D.S.C. Apr. 11, 2012). Nevertheless, "when a properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Fed. R. Civ. P. 56(e)). The plain language of Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion." Major, 2012 WL 2000680, at *1.

### III.   DISCUSSION

Crown Castle argues that summary judgment is warranted on its fourth and fifth causes of action because "the City's denial of the four applications was not supported by substantial evidence in the written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii), and for the three [conditionally granted] applications . . . , the City failed to act in a timely manner, as required by 47 U.S.C. § 332(c)(7)(B)(ii)." ECF No. 15-1 at 1. The court discusses the four denied applications first, then turns to the three applications that the City conditionally granted. For the reasons that follow, the court denies Crown Castle's motion with respect to the denied applications and grants the motion with respect to the conditionally granted applications.

### A.  Denied Applications

Of the sixteen applications at issue in Crown Castle I, the City explicitly denied four. Those four denied applications represent Nodes designated as CHS-026, CHS-027, CHS-028, and CHS-032. Crown Castle argues that the City's denial of those applications violates § 332(c)(7)(B)(iii) of the Telecommunications Act because the denials "have no

6

basis [in] the City's own [Small Cell] Ordinance and are not supported by substantial evidence in the record[.]" ECF No. 15-1 at 18. The court disagrees on both fronts.

The Telecommunications Act of 1996 ("TCA") seeks "to limit the ability of state and local governments to frustrate the [ ] national purpose of facilitating the growth of wireless telecommunications, [while] preserv[ing] state and local control over the siting of towers and other facilities that provide wireless services." T-Mobile Ne. LLC v. City Council of City of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012) (quoting 360° Commc'ns Co. of Charlottesville v. Bd. of Sup'rs of Albemarle County, 211 F.3d 79, 86 (4th Cir. 2000)). "To strike this balance, the [TCA] preserves the power of the local zoning authority 'over decisions regarding the placement, construction, and modification of personal wireless service facilities,' while placing certain limits on that authority." Id. (quoting 47 U.S.C. § 332(c)(7)(A)); see also Preferred Sites, LLC v. Troup Cty., 296 F.3d 1210, 1214 (11th Cir. 2002) ("Congress . . . acknowledged [that] there are legitimate State and local concerns involved in regulating the siting of [small cell wireless] facilities[,] such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way.").

To that end, § 332(c)(7)(B)(iii) of the TCA provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). To determine whether a local body's denial of a service provider's application comports with § 332(c)(7)(B)(iii), courts in the Fourth Circuit employ a two-pronged inquiry. First, the court "look[s] to the applicable zoning ordinance to determine whether the reasons for the

City's decision are contemplated therein." Newport News, 674 F.3d at 387. Where the local body's decision is well-rooted in applicable local law, the court must then "determin[e] whether substantial evidence supports the denial . . . ." Id. at 388. Crown Castle argues that the City's denial of four of its applications fails on both prongs. For the reasons set forth below, the court disagrees.

### 1. Basis in Local Law

With respect to the first prong, Crown Castle first argues that the City's denials "conflict with the [Small Cell] Ordinance by vesting in the Mayor final, unilateral authority to grant or deny the application." ECF No. 15-1 at 19. Crown Castle explains that the process by which the City denied the applications runs afoul of local law because the Small Cell Ordinance authorizes the DRC to grant or deny small wireless facility permit applications, and, here, according to Crown Castle, the denials were based upon the Mayor of the City's unilateral view. There are two problems with Crown Castle's argument, the first of which is rooted in a misunderstanding of the nature of court's limited review. Section 332 of the TCA authorizes the court to review the decision of a local governing body and determine whether "the reasons for [the body's] decision are contemplated" by local law. Newport News, 674 F.3d at 387. In other words, the court can ask only whether the reasons for the denial comport with some codified standard. Here, Crown Castle asks the court to do something different—it argues that the court should invalidate the decision of the City because the process by which the City reached its decision does not comport with local law. But the plain text of § 332 clearly limits the court's review to the "why" of a denial; the "how" of a denial is simply beyond the scope of the court's review. As such, the court cannot scrutinize the process by which Crown

Castle's application was denied; it can only review whether the reasons for the denial are

rooted in local law and supported by substantial evidence.  See T-Mobile Cent., LLC v.

Unified Gov't of Wyandotte Cty., Kansas City, Kan., 546 F.3d 1299, 1306–07 (10th Cir.

2008) ("Judicial review under [§ 332] is quite narrow.").

Moreover, in Crown Castle I, the court expressed skepticism with respect to

Crown Castle's process argument:

> [T]he court is not entirely convinced that the Mayor's involvement is
> improper.  At the hearing on the motion, counsel for the City explained that
> the DRC was designed for the sole purpose of making recommendations to
> the Mayor about whether or not design-related elements of right-of-way
> changes should be approved.  ECF No. 90, Tr. 38:19–23.  Counsel explained
> that no DRC item gets approved without mayoral approval, so that if the
> Small Cell Ordinance reads that DRC approval is required, it is implied that
> mayoral approval is also required.

Crown Castle I Order at 16–17 n.3.  As such, the court declines to scrutinize the process

by which the City denied the applications.

Next, Crown Castle argues that the denials "are defective because the City relies

on reasons that are not valid criteria for evaluation under the City's [Small Cell]

Ordinance or Design Guidelines."  ECF No. 15-1 at 19.  Crown Castle explains that the

City's denials do not cite substantive provisions of the Small Cell Ordinance or the

Design Guidelines but instead rely upon "provisions of the Design Guidelines and [Small

Cell] Ordinance that set forth broad statements of purposes or goals."  Id. at 20.  As one

epitomic example, the City's denial of Crown Castle's application for Node CHS-026

states:

> The DRC finds that [the] modified application for the proposed placement
> of a new Tower as shown on Exhibit A should be denied.  The Proposed
> location of a new Tower is inconsistent with the overall design review
> guidelines as well as the findings and provisions of [the Small Cell
> Ordinance].  Specifically, it does not "preserve the character of the

> neighborhood" in issue.  (Design Guidelines 1(A)).  It fails to minimize the visual impact and bulk in the right-of-way by architecturally integrating the proposed tower with its surroundings.  (Ordinance 2018-154 (1) – Findings).  Likewise, it does not provide a uniform look and feel with the adjoining historical area in that it stands out significantly when compared to its historical setting.  (Id. At Finding 5).  This is the very situation the City sought to avoid in adopting [the Small Cell Ordinance] and by attempting to minimize to the maximum extent the use of new Towers in the Peninsula District of the City.

ECF No. 15-15 at 3 (citations in original).  This denial, like the others, relies on provisions within the "Findings" section of the Small Cell Ordinance and the "Background and Purpose" section of the Design Guidelines.  According to Crown Castle, the City may not rely upon these provisions of local law and must instead base denials on a law's more substantive provisions.

The court disagrees, as have other courts who have considered the issue.  In Se. Towers, LLC v. Pickens Cty., Ga., the Northern District of Georgia considered a county commissioner's denial of a telecommunications service provider's application for a tower permit.  625 F. Supp. 2d 1293 (N.D. Ga. 2008).  There, like here, the local governmental body denied the provider's application based upon the "General Purpose" section of the applicable local ordinance.  Also like here, the provider argued that the local decisionmaker's reliance on a "Goals" provision violated § 332, and, like this court, the court in Pickens County disagreed:

> In this case, the Commissioner denied SE Towers' application for a tower permit after concluding that the proposed tower would have a material visual impact on the surrounding Tate Historical District.  [T]he Commissioner had the authority to do so based upon the general purpose and specified guidelines provided in Section 66–75 of the Pickens County Tower Ordinance.  Although Section 66–75 characterizes the guidelines to be applied to permit decisions as 'goals' as opposed to 'factors,' in the Court's view, the semantical distinction does not negate the authority contained in Section 66–75 and render its guidance concerning the location of cell towers meaningless and mere surplusage.  To the contrary, Section

66–75 provides specific guidelines to consider in the siting of towers, giving effect to the purpose of the Pickens County Tower Ordinance.  Nor does it conflict with the TCA, because "[n]othing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and . . . aesthetic harmony is a prominent goal underlying almost every such code."  VoiceStream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 831 (7th Cir. 2003) (quoting Aegerter v. City of Delafield, 174 F.3d 886, 891 (7th Cir. 1999)).

Pickens Cty, 625 F. Supp. 2d at 1301–02.[1]

The court agrees with the reasoning of the court in Pickens County.  Aesthetic and preservationist concerns lie at the heart of each of the City's denials.  Both the Small Cell Ordinance and the Design Guidelines explicitly authorize the DRC to engage with such considerations in considering an application.  See, e.g., ECF No. 15-2 (stating the Small Cell Ordinance shall "[p]rovide standards for Small City Wireless Facilities in the City's [public rights-of-way] to provide a uniform look and feel"); ECF No. 15-3 (stating that a purpose of the Design Guidelines is to "preserve the character of neighborhood, corridors, and districts" by "minimiz[ing] visual impact and bulk in the [public rights-of-way] by architecturally integrating the Small Wireless Facility with its surroundings").  Like the court in Pickens County, this court is unmoved by the semantical difference between "goals" or "purposes" the law authorizes the DRC to consider and more substantive "factors" that it must consider.[2]  Congress designed the TCA to curb local

---

[1] At the hearing, Crown Castle attempted to distinguish Pickens County from the present case by noting that the court there analyzed whether the local law authorized the local commission's rationale for its denial, and the court here must analyze whether the basis for denial is well-rooted in local law.  This is a distinction without a difference because both questions get at the same inquiry—does local law provide a codified basis for the written reasons for denial.

[2] Crown Castle cites, without explanation, to two cases in support of its contention: Wyandotte Cty., 546 F.3d at 1310, and Virginia Metronet, Inc. v. Bd. of Sup'rs of James City Cty., Va., 984 F. Supp. 966, 974 (E.D. Va. 1998).  The courts in these cases held that "Governing bodies cannot simply arbitrarily invent new criteria in

decisionmakers' ability to "frustrate . . . the growth of wireless communication," but also to ensure the preservation of local authority over the decision to erect and modify wireless facilities.  Newport News, Va., 674 F.3d at 385.  To deny the City the ability to effectuate the codified goals and purposes of its own legislation would be to serve the former purpose at the complete expense of the latter.  See Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005) ("The TCA thus strikes a balance between 'two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'").  Section 332 of the TCA constitutes a limit on local power, not an abrogation.  As such, the court finds that the City's denials are well-rooted in local law.

### 2.  Substantial Evidence

With respect to the second prong of the court's review, Crown Castle argues that "the denials are not supported by substantial evidence in the record . . . because the denials are conclusory and there is no evidence opposing Crown Castle's application to support denial."  ECF No. 15-1 at 22.  The City, of course, contends that substantial evidence does support the denials.  The court agrees with the City.

A familiar standard in the realm of administrative law, the Fourth Circuit defines "substantial evidence" to mean "more than a mere scintilla of evidence but less than a preponderance," Newport News, 674 F.3d at 385, and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," AT & T Wireless

order to reject an application."  Virginia Metronet, 984 F. Supp. at 974.  That law has no application here, as the criteria on which the City based its denial are codified in the Small Cell Ordinance and the Design Guidelines.  The fact that criteria set aesthetic standards does not render them arbitrary.

PCS, Inc. v. City Council of the City of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998) (quoting Universal Camera v. NLRB, 340 U.S. 474, 488 (1951)).  "In reviewing whether the denial of a permit application is supported by substantial evidence, a court is not free to substitute its judgment for the agency's (or [ ] the legislature's); it must uphold a decision that has substantial support in the record as a whole even if it might have decided differently as an original matter."  Newport News, 674 F.3d at 386 (quoting Virginia Beach, 155 F.3d at 430) (internal quotation marks omitted).  "The party seeking to overturn the local [decisionmaker's] decision has the burden of proving that the decision is not supported by substantial evidence."  VoiceStream Minneapolis., 342 F.3d at 830 (quoting American Tower LP v. Cty of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002))

Crown Castle posits several different theories for its position that the City's denials are unsupported by substantial evidence in the record.  First, Crown Castle contends that the denials "reflect[ ] the unilateral, subjective opinion of the Mayor" rather than evidence in the record.  ECF No. 15-1 at 22.  Here, Crown Castle again asks the court to venture beyond the "quite narrow" review § 332 authorizes.  Wyandotte Cty, 546 F.3d at 1306–07.  As the court explained above, § 332 authorizes the court to analyze a "decision by a [ ] local government"—not the process by which it came to fruition— based upon the reasons for the decision "contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii); see also Newport News, 674 F.3d at 387 (authorizing judicial review of "whether the reasons for the City's decision are contemplated" by local law).  The court's review is objective, precluding it from analyzing the perceived subjective intentions of any decisionmaker.  See Albemarle County, 211 F.3d at 83 ("[W]hen

reviewing the decision of a local elected body, we take 'a reasonable mind' to refer to the mind of a reasonable legislator."). Moreover, the record is bereft of any actual evidence from which the court could determine the subjective basis for a local decisionmaker's decision—be it the Mayor or a member of the DRC. See ECF No. 15-1 at 22 (arguing that the Mayor "apparently imposed his unilateral view that the applications should be denied."). As such, the court reviews the denials based on the written record, not upon alleged subjective thoughts or motivations behind the denials. Thus, Crown Castle's first theory fails.

Next, Crown Castle argues that the denials are not supported by substantial evidence because the record does not contain evidence of public opposition to the proposed wireless facilities. In support, Crown Castle cites Newport News, in which the Fourth Circuit held that "vague and uncorroborated concerns" by three members of the public did not constitute "substantial evidence" to support a local body's the denial of a tower permit. 674 F.3d at 390. Crown Castle's argument is misguided. Newport News stands for the proposition that not all public opposition to a permit application constitutes "substantial evidence" to justify a denial. The Fourth Circuit did not hold in Newport News, nor in any other case of which the court is aware, that a local government's decision to deny a tower permit must be supported by some form of public opposition.[3] In other words, the law is clear that public opposition may constitute sufficient evidence to support a denial, but it is certainly not necessary for a finding that a denial is supported

---

[3] The same goes for the other cases on which Crown Castle relies. See T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield, 691 F.3d 794 (6th Cir. 2012); Petersburg Cellular P'ship v. Bd. of Sup'rs of Nottoway Cty., 205 F.3d 688, 692 (4th Cir. 2000).

by substantial evidence in the record.  Therefore, the lack of public opposition, in itself, gives the court no reason to invalidate the City's denials.

Finally, Crown Castle engages in an individualized review of each denial, arguing that each contains "specific faults."  ECF No. 15-1 at 25.  Because the City bases each denial on similar evidence and similar provisions of local law and because Crown Castle's arguments with respect to each are similar, the court discusses the denials together.  Each of the proposed Nodes is located on the historic peninsula of downtown Charleston.  Two of the four proposed Nodes are located near two of the City's most famous and most photographed historic landmarks: Node CHS-026 would be adjacent to "Rainbow Row" on East Bay Street, and Node CHS-032 would be positioned near the intersection of Broad and Meeting Streets, known colloquially as the "Four Corners of Law."  Each of the City's denial letters states a similar rationale behind the denial: the Nodes are "inconsistent with the overall design review guidelines as well as the findings and provisions of [the Small Cell Ordinance]," ECF No. 15-15 at 2; they "fail[ ] to minimize the visual impact and bulk in the right-of-way by architecturally integrating the proposed tower[s] with [their] surroundings," ECF No. 15-18 at 2; they "do[ ] not provide a uniform look and feel with the adjoining historical area," id.; and they "do[ ] nothing to contribute to and in fact detract[ ] from a uniform look and feel for th[e] setting . . . ." ECF No. 15-17 at 3.  As discussed above, the City's written rationale for the denials cites to several provisions in the "Findings" section of the Small Cell Ordinance and the "Background and Purpose" section of the Design Guidelines.

Crown Castle argues that the City's "conclusory and subjective reasoning" for its denials is not supported by substantial evidence in the record.  Again, the court disagrees.

"Aesthetic concerns may be a valid basis for denial of a permit if substantial evidence of the visual impact of the tower is before the board." Preferred Sites, LLC v. Troup Cty., 296 F.3d 1210, 1219 (11th Cir. 2002). "[G]eneralized concerns about aesthetics," without evidence of visual impact, however, do not constitute substantial evidence for denial. Sw. Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 60 (1st Cir. 2001), abrogated on other grounds by T-Mobile S., LLC v. City of Roswell, Ga., 574 U.S. 293 (2015). Courts have found that photos of the proposed site in the record constitute substantial evidence supporting aesthetic concerns. Pickens Cty., 625 F. Supp. 2d at 1304 ("The decision was not based upon merely general objections to the aesthetic appeal of a telecommunications tower; rather, photographs and specific supporting testimony demonstrated that the proposed tower would have a specific and material impact on the landscape and buildings within the Historic District.").

Here, each of the denials includes a photo simulation of the proposed Node and explicitly incorporates the photo simulation into its denial. See, e.g., ECF No. 15-15 at 1–2 ("The photo simulation for the last proposal made by Crown [Castle] is attached as Exhibit A and incorporated by reference."). And each of the denials cites specific aesthetic concerns raised by the proposed towers. See, e.g., ECF No. 15-17 at 3 ("[The proposed tower] does not provide a uniform look and feel as it stands out significantly when compared to its setting."). A review of the photo simulations provides clear evidence for the aesthetic concerns expressed in each of the City's denial letters. Indeed, the photo simulations depict large, black poles, up to 35 feet in height, planted in the middle of various historic locations in downtown Charleston. See, e.g., 15-6 at 6. Without conducting its own review or substituting its taste for that of the DRC, the court

16

can easily understand how a reasonable legislator might conclude that the proposed

Nodes "do[ ] not provide a uniform look and feel with the adjoining historical area, ECF

No. 15-18 at 2, or "detract[ ] from a uniform look and feel for th[e] setting," ECF No. 15-

17 at 3.  As such, the DRC clearly had "evidence of the visual impact of the tower,"

Preferred Sites, 296 F.3d at 1219, meaning that the aesthetic rationale for the denials pass

muster as more substantial than "generalized expressions of concern," Todd, 244 F.3d at

60.  Therefore, the court finds that the City's denials of Crown Castle's applications are

supported by substantial evidence in the record.  As such, the court denies Crown

Castle's motion for summary judgment with respect to its fourth cause of action.

### B.  Conditionally Granted Applications

Crown Castle also moves for summary judgment on its fifth cause of action,

which asserts that the City has violated § 332(c)(7)(B)(ii) because it has not acted on

three of Crown Castle's applications within a reasonable time.  To recap, in Crown Castle

I, the court ordered the City to respond to Crown Castle's then-pending sixteen

applications within 90 days of March 23, 2020.  On June 22, 2020, the City conditionally

granted three of Crown Castle's applications, designated as Nodes CHS-001, CHS-016,

and CHS-023, on the condition that Crown Castle place the proposed Nodes on City-

owned poles.  The placement of Nodes onto City-owned poles requires Crown Castle to

enter into "pole-use agreements" with the City.  Crown Castle has provided the City with

a draft pole-use agreement, and the City has failed to respond.  Crown Castle explains

that although the City has conditionally granted three applications, it has "effectively

fail[ed] to take final action on those [ ] applications" because it has yet to issue any pole-

use agreements or respond to the one proposed by Crown Castle.  ECF No. 15-1 at 3.  In

its response, the City states: "[T]he City believes all such issues will be resolved and these poles will not be in issue when this matter is fully brief [sic] and considered by this court, which will render this issue moot."  ECF No. 17 at 1.  At the February 11, 2021 hearing on the motion, the City noted that it had responded to Crown Castle's proposed pole-use agreement with a proposed agreement of its own the day before and that it plans to work with Crown Castle to reach a satisfactory result.  As such, no pole-use agreement has yet been reached, but the City has reemerged at the negotiating table, albeit at the last possible opportunity.

Section 332(c)(7) states that "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."  47 U.S.C. § 332(c)(7)(B)(ii).  The FCC has adopted a regulation providing that when an authority fails to act on a sitting application on or before the "shot clock" date of an application, the authority is presumed to not have acted within a reasonable period of time.  47 C.F.R. § 1.6003(a).  The shot clock period is calculated by adding the number of days of the presumptively reasonable time period, as provided later in the regulation, and the number of days of the tolling period, if applicable.  Id. § 1.6003(b).  Relevant here, the number of days of a presumptively reasonable time period to act on an application to install a Small Wireless Facility using an existing structure, in this case a pole, is 60 days.  Id. § 1.6003(c)(1)(i).  When the application seeks to install a Small Wireless Facility using a new structure, the period is 90 days.  Id. § 1.6003(c)(1)(iii).  Neither party here argues that any tolling period is applicable.

Although the City has now responded to Crown Castle's proposed pole-use agreement, the court cannot ignore its untimeliness.  The court ordered the City to resolve Crown Castle's application within 90 days of March 23, 2020.  The City conditionally granted the three at-issue application on June 22, 2020.  The City did not work with Crown Castle to negotiate a pole-use agreement for nearly eight months, despite Crown Castle's submission of a proposed agreement.  It seems clear to the court that the City's failure to timely negotiate a potential pole-use agreement constitutes a violation of § 332(c)(7)(B)(ii), even though the City has finally expressed a willingness to start negotiating.  As such, summary judgment is warranted with respect to Crown Castle's fifth cause of action.  Because the court grants summary judgment on this issue, it must determine the proper remedy, another issue on which the parties disagree.  Crown Castles argues that "the appropriate remedy is, at a minimum, to order the City immediately to execute the draft agreement for use of the City's poles."  ECF No. 15-1 at 34.  Alternatively, Crown Castle suggests that "the Court should order the City immediately to approve Crown Castle's proposal without using the City-owned poles."  Id.  The court finds neither prudent.

"The TCA does not specify a remedy for violations of the cellular siting subsection."  Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 497 (2d Cir. 1999).  When the FCC received comments on 47 C.F.R. § 1.6003, several commenters advocated for the FCC to "adopt a deemed granted remedy."  In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. at 9153.  The FCC declined to do so, explaining that it is "confident that the rules and interpretations adopted here will provide substantial relief, effectively avert unnecessary

litigation, allow for expeditious resolution of siting applications, and strike the appropriate balance between relevant policy considerations and statutory objectives guiding [its] analysis." Id. at 9153–54.  Therefore, the court has full discretion in determining what proper injunctive relief is warranted for a violation of the shot clock.

The court confronted the same dilemma in Crown Castle I.  By way of review, the court denied Crown Castle's motion for summary judgment in part but granted it in part for the same reason it does here—the City's shot clock violation under § 332(c)(7)(B). After a lengthy discussion, the court concluded in Crown Castle I that injunctive relief is inappropriate when "the court is only faced with a shot clock violation[.]"  Crown Castle I Order at 20.  Instead, the court found "it more appropriate to order the City to render a decision on Crown Castle's applications within a specified number of days of this order, as courts face[d] with similar situations have done."  Id. at 23 (citing Up State Tower Co., LLC v. Town of Kiantone, New York, 2016 WL 7178321, at *7 (W.D.N.Y. Dec. 9, 2016), aff'd, 718 F. App'x 29 (2d Cir. 2017)).  With the purpose of the TCA in mind, the court opts for the same resolution here.  This remedy seems doubly appropriate at this juncture, given that the City has finally responded to Crown Castle's proposed pole-use agreement.  Therefore, the court orders the City to issue a decision with respect to Crown Castle's proposed pole-use agreement within 30 days of this order.

## IV.   CONCLUSION

For the foregoing reasons the court **GRANTS IN PART** and **DENIES IN PART** the motion.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 15, 2021**
**Charleston, South Carolina**